UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                    Plaintiffs,                    09 Civ. 8071 (BSJ) (FM)

          v.                                       ECF Case

DEPARTMENT OF DEFENSE; CENTRAL
INTELLIGENCE AGENCY; DEPARTMENT OF
STATE; DEPARTMENT OF JUSTICE,

                    Defendants.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

MELISSA GOODMAN (MG-7844)
JONATHAN HAFETZ (JH-0843)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-549-2500
Fax: 212-549-2629

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, New York 10004

March 10, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.   DOD HAS NOT MET ITS BURDEN TO JUSTIFY WITHHOLDING OF BASIC
     INFORMATION ABOUT BAGRAM DETAINEES UNDER EXEMPTION 1 ............. 5

     A.   DOD Has Not Shown that Basic Information About the Detainees is
          Classifiable ........................................................................................................ 5

     B.   DOD Has Not Shown that Disclosure of Basic Information About the
          Detainees is Likely to Cause Harm to National Security ..................................... 7

II.  DOD HAS NOT MET ITS BURDEN TO JUSTIFY WITHHOLDING
     DETAINEES' FULL IDENTIFICATION NUMBERS UNDER EXEMPTION 2 ........ 11

III. CIA HAS NOT MET ITS BURDEN TO JUSTIFY ITS REFUSAL TO PROCESS
     PLAINTIFFS' FOIA REQUEST .................................................................................. 13

     A.   Exemption 1 Does Not Supply a Valid Basis for Refusing to Process
          the Request ...................................................................................................... 14

          1.   CIA's Exemption 1 Claim is Insufficiently Justified.............................. 14

          2.   CIA's Exemption 1 Claim is Contradicted by Contrary Evidence........... 15

               a.   Merely Processing Requests #6 or #10 Would Not Reveal
                    Secret Intelligence Methods, Tools, or Activities.......................... 16

               b.   Merely Processing Requests #6 or #10 Would Not Reveal a
                    Secret Location of CIA Activity .................................................... 19

               c.   Merely Processing Request #6 or #10 Would Not Reveal
                    Secret CIA Sources or Targets....................................................... 24

     B.   Exemption 3 Does Not Supply a Valid Basis for Refusing to Process the
          Request ............................................................................................................ 27

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y 2005)..................................................... 14

*ACLU v. Dep't of Def.*, 396 F. Supp. 2d 459 (S.D.N.Y. 2005)......................................13, 24, 25

*ACLU v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008) .................................................................... 4

*Ahmed v. Obama*, 613 F. Supp. 2d 51 (D.D.C. 2009) ................................................................. 1

*ACLU v. Dep't of Def.*, 339 F. Supp. 2d 501 (S.D.N.Y. 2004).................................................... 4

*Assoc. Press v. Dep't of Def.*, 554 F.3d 274 (2d Cir. 2009) ....................................................... 4

*Berman v. CIA*, 501 F.3d 1136 (9th Cir. 2007)................................................................... 25, 29

*Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35 (D.D.C. 1999).................................................. 13

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998)....................................................... 4

*Carney v. Dep't of Justice*, 19 F.3d 807 (2d Cir. 1994).............................................................. 4

*Carter v. Dep't of Commerce*, 830 F.2d 388 (D.C. Cir. 1987) ................................................. 10

*Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824 (D.C. Cir. 1979) ........................... 29

*CIA v. Sims*, 471 U.S. 159 (1985) ............................................................................................ 29

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) .............................................................. 3

*Earth Pledge Found. v. CIA*, 988 F. Supp. 623 (S.D.N.Y. 1996)............................................. 30

*El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285 (D.Conn 2008) .......................... 15

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56 (D.D.C. 2007)....................... 29

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990)............................................................... 28, 29

*Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978)........................................................................ 30

*Goldberg v. Dep't of State*, 818 F.2d 71 (D.C. Cir. 1987) ......................................................... 4

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ................................................................... passim

*Hunt v. CIA*, 981 F.2d 1116 (9th Cir. 1992) ............................................................................ 29

*King v. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ..................................................... 5, 6, 8

*Lamont v. Dep't of Justice*, 475 F. Supp. 761 (D.C.N.Y. 1979) ................................................. 23

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ................................................4, 14, 28

*Linn v. Dep't of Justice*, No. 92-1406, 1995 WL 417810 (D.D.C. June 6, 1995)................. 12, 13

*Makky v. Chertoff*, 489 F. Supp. 2d 421 (D.N.J. 2007) ............................................................ 30

*Maqaleh v. Gates*, 604 F. Supp. 2d 205 (D.D.C. 2009) ............................................................. 1

*Massey v. FBI*, 3 F.3d 620 (2d Cir. 1993) .......................................................................... 11, 13

*McDonnell v. United States*, 4 F.3d 1227 (3d Cir. 1993) ........................................................... 7

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ...................................................................... 15

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978)........................................................ 3

*Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) ...................................................................... 29

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) .......................................................................... 5

*Rubin v. CIA*, 2001 WL 1537706 (S.D.N.Y. 2001) .................................................................. 29

*Schoenman v. FBI*, 2009 WL 763065 (D.D.C. Mar. 19, 2009) ................................................ 28

*Sirota v. CIA*, 1981 WL 158804 (S.D.N.Y Sept. 18, 1981)...................................................... 29

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ...................................................... 19

*Wash. Post v. Dep't of Def.*, 766 F. Supp. 1 (D.C. Cir. 1991).........................................19, 23, 24

*Wiesenfelder v. Riley*, 959 F. Supp. 532 (D.D.C. 1997)............................................................ 11

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) ................................................ passim

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ...........................................................13, 19, 28, 29

**Statutes**

5 U.S.C. § 552 ................................................................................................ 4, 5, 11

50 U.S.C. § 403-1 ............................................................................................. 27, 28

50 U.S.C. § 403g .............................................................................................. 27, 29

**Other Authorities**

Exec. Order 13,292,  Fed. Reg. 15315 (Mar. 25, 2003) ........................................... 5

H. Conf. Rep. 108-796 § 1011 ............................................................................. 27

Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"),
    Pub. L. No. 108-458 ....................................................................................... 27

**PRELIMINARY STATEMENT**

This case concerns the public's right to information about the U.S. prison at Bagram Air Base in Afghanistan, where the United States has, since 2002, detained thousands of people in harsh conditions, without access to lawyers, courts, and, until recently, with a military status review process that fell "well short of what the Supreme Court found inadequate at Guantanamo." *Maqaleh v. Gates*, 604 F. Supp. 2d 205, 227 (D.D.C. 2009), *appeals argued*, (D.C. Cir. Jan. 7, 2010).  The United States is reportedly holding nearly 750 people at Bagram today and claims the authority to detain them indefinitely.  The government has kept secret the most basic facts about these prisoners; until recently, the public did not even know their names. The government has also suppressed much of Bagram's dark history.  The little that is known is troubling.  Some of the United States' most brutal and shameful torture practices were employed at Bagram.  *See Ahmed v. Obama*, 613 F. Supp. 2d 51, 61, 63 (D.D.C. 2009) (finding allegations of abuse at Bagram "widespread" and "credible").  Bagram has also been a key hub in the Central Intelligence Agency's ("CIA") extrajudicial kidnapping and rendition program and was reportedly the site of one of the CIA's now-shuttered secret prisons.

In order to shine light on the secretive Bagram prison, plaintiffs submitted a Freedom of Information Act ("FOIA") request to the Department of Defense ("DOD"), CIA, State Department, and Justice Department ("DOJ").  Declaration of Jonathan Hafetz ("Hafetz Decl.") ¶ 3, Exh. A.  Requests #1-5 sought current Bagram detainees' names; citizenship; and the date, location, and the general circumstances of their capture.  Request #6 sought records about the rendition or transfer of individuals captured outside of Afghanistan to Bagram.  Requests #7 and #9 sought certain agreements between the U.S. and Afghan governments regarding Bagram detainees.  Request #8 sought records about the status review process at Bagram.  Request #10 sought records pertaining to the treatment of Bagram prisoners and their conditions of

confinement.  Plaintiffs commenced this suit in September 2009, after five months had elapsed without the release of a single document from any of the agencies.

There are currently two issues before the Court.  The first is whether DOD is improperly withholding very basic facts about the Bagram detainees.  Although the DOD, to its credit, has released to plaintiffs a document that lists detainees' names and partial identification numbers, it continues to withhold every other piece of information in that document, including each detainee's citizenship, length of detention, location, date, and general circumstances of capture, and full identification numbers.  DOD relies on FOIA Exemption 1 to withhold most of this information but it has not met its burden to demonstrate that it is actually classifiable or that its disclosure is likely to harm national security; in fact, DOD's argument is significantly undermined by its own release of this very type information about specific Bagram detainees and similarly-situated Guantánamo prisoners.

The information DOD is suppressing is vital to the public's understanding of U.S. detention policy.  There is serious concern that the United States is subjecting Bagram prisoners to excessively prolonged detention – some for nearly eight years.  But without release of detention-length data, the public cannot know whether this is typical or aberrational.  There is also significant concern that the United States is detaining at Bagram people captured far from any battlefield and people who have never engaged in any hostilities.  Without release of information about detainees' basic circumstances of capture, however, the public cannot know whether this concern is justified.  There is immense concern, moreover, that there are prisoners at Bagram who were captured in foreign countries far from Afghanistan and transferred or "rendered," without any judicial process, to military detention there.  Indeed, with the impending closure of Guantánamo, and the shuttering of CIA prisons, many fear that the United States is simply detaining suspected terrorists it captures abroad at Bagram instead.  *See* Eric Schmitt,

2

*U.S. to Expand Detainee Review in Afghan Prison*, N.Y. Times, Sept. 12, 2009 (quoting official admitting that "the importance of Bagram as a holding site for terrorism suspects captured outside Afghanistan . . . has risen under the Obama administration.").   Without disclosure of detainees' places of capture, however, the public cannot understand the scope of this problem.

The second issue before the Court is whether the CIA has improperly refused to process plaintiffs' request.  The CIA maintains that the mere fact that it may possess records about rendition and interrogation policies and practices at Bagram is exempt from disclosure under FOIA Exemptions 1 and 3.[1]  The CIA, however, has not sufficiently demonstrated that merely processing the request would reveal any secrets at all about the CIA's methods, activities, location of operations, or sources, let alone secrets likely to harm national security if disclosed. Indeed, the CIA's claim is contradicted by volumes of contrary evidence that show that the CIA's rendition or transfer of suspected terrorists to military custody at Bagram, and its interrogation of prisoners there, has been publicly acknowledged and is widely known.

Accordingly, plaintiffs respectfully request that the Court deny the government's motion for partial summary judgment, and grant the plaintiffs' cross-motion on these issues.[2]

## ARGUMENT

The purpose of FOIA is "broad disclosure" of government records.  *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989); *see also Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999) (FOIA "adopts as its most basic premise a policy strongly favoring public disclosure"). FOIA's presumption of full disclosure "ensure[s] an informed citizenry, vital to the functioning of a democratic society."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see*

---

[1]  As discussed below, *infra* at 13 n.7, plaintiffs withdraw some parts of their request to the CIA.

[2]  Plaintiffs have no objections to the government's Statement of Facts as to the administrative and procedural history of the case, to which there is no genuine, material dispute.  Plaintiffs, like defendants, have not submitted a Statement of Undisputed Facts but will do so if it is helpful to the Court.

*also ACLU v. Dep't of Def.*, 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004) (FOIA "provide[s] a means of accountability, to allow Americans to know what their government is doing.").

FOIA "mandates disclosure of records . . . unless the documents fall within [FOIA's] exemptions." *Dep't of the Interior and Bur. of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001). Exemptions are "narrowly construed" and all doubts "are to be resolved in favor of disclosure." *ACLU v. Dep't of Def.*, 543 F.3d 59, 66 (2d Cir. 2008).

The agency bears the "burden . . . to justify the withholding of any requested documents." *Assoc. Press v. Dep't of Def.*, 554 F.3d 274, 283 (2d Cir. 2009). The agency must provide "reasonably detailed explanations why any withheld documents fall within any exemption." *Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

Courts review exemption claims *de novo*, and may examine documents *in camera*. 5 U.S.C. § 552(a)(4)(B). When an agency invokes a national security exemption its affidavits are typically afforded "substantial weight" but only if they are not "controverted by contrary evidence." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009). Summary judgment is warranted only where agency "affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by . . . contrary evidence in the record." *Id.* at 73.

Even in the face of national security-related exemption claims, the Court must not "relinquish[] [its] independent responsibility" to assess the propriety of the agency's justifications. *Goldberg v. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987); *see also Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) ("deference is not equivalent to acquiescence"). FOIA rests on the premise that "judges c[an] be trusted to approach . . . national

security determinations with common sense, and without jeopardy to national security." *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978).

I.   DOD HAS NOT MET ITS BURDEN TO JUSTIFY WITHHOLDING OF BASIC INFORMATION ABOUT BAGRAM DETAINEES UNDER EXEMPTION 1.

FOIA Exemption 1 permits an agency to withhold information that is properly classified under the executive order that governs classification.  5 U.S.C. § 552(b)(1).  Information may be classified under Exec. Order 13,292, 68 Fed. Reg. 15315 (Mar. 25, 2003), only where, among other things, it falls within one of the categories of classifiable information set out in § 1.4 of the Order, and the classification authority determines "disclosure of the information reasonably could be expected to result in damage to the national security" and is "able to identify or describe the damage," § 1.1.  DOD has released to plaintiffs the name of each Bagram detainee but has withheld their citizenships, length of detention, and the date, place, and general circumstances of their capture, invoking Exemption 1.  *See* Hafetz Decl. ¶ 4, Exh. B.

A.   DOD Has Not Shown that Basic Information About the Detainees is Classifiable.

DOD has the burden to explain with specificity how the information it withholds "falls within the enumerated categories of classifiable information." *King v. Dep't of Justice*, 830 F.2d 210, 221 n.91 (D.C. Cir. 1987).  The categories DOD invokes here are "military plans, weapons systems, or operations"; "intelligence activities . . . sources or methods"; and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security."  Declaration of Maj. Gen. Hood ("Hood Decl.") ¶ 5.

DOD does not explain at all – let alone with specificity – how the basic data about the detainees it withholds actually falls within any of these categories.  All that can be found in the four substantive paragraphs of Maj. Gen. Hood's declaration is the assertion that "the withheld information . . . reveals details about the operation that resulted in a detention . . . intelligence we have gleaned . . . and further exposes our vulnerabilities relating to national security."  Hood

Decl. ¶ 6.  But this assertion is inappropriately categorical.  The declaration makes no effort to apply the classification categories to *each piece* of information withheld; it speaks only of "the withheld information" as an undifferentiated whole.  *See Halpern*, 181 F.3d at 293 (rejecting Exemption 1 claim where affidavit "barely pretend[ed] to apply the terms of [the Executive Order's classification categories] to the specific facts of the documents at hand.").

      This assertion is also inappropriately bare and conclusory.  The Hood declaration leaves it entirely to the Court to divine how a detainee's citizenship or length of detention, for example, even relates to military "systems, installations, infrastructures, projects, plans, or protection services," let alone how this information could "expose" a "vulnerability" in any of these things, or even what kind of vulnerability is at stake.  Hood Decl. ¶ 6.  Similarly, DOD does not attempt to explain what a detainee's citizenship and length of detention, alone, could reveal about intelligence sources or intelligence the military has "gleaned" from the detainee or others, or the "military operation" that led to their detention.  *Id.*[3]  Thus, DOD has failed to sufficiently show how a detainees' citizenship or detention-length even fall within one these classification categories.  *See King*, 830 F.2d at 223 (rejecting Exemption 1 claim where the court "not furnished with sufficient information to [assess it] in a meaningful fashion."); *Halpern*, 181 F.3d at 293 (rejecting Exemption 1 claim based on "conclusory" assertions).

      The same is true of the date, location, and general circumstances of a detainee's capture.  It is not apparent how this information even concerns military "systems, installations, infrastructures, projects, plans, or protection services," let alone how it could "expose" a "vulnerability," Hood Decl. ¶ 6; if anything, the successful capture of a detainee would expose

---

[3] Although the Hood declaration does not explain what a detainee's length of detention would reveal about a military operation, one might assume it could reveal something about an operation's timing.  But even this is not obvious.  Bagram detainees were not necessarily transferred to Bagram immediately upon capture; it is well-known that many have been captured and held in other locations for months or even years before being transferred to Bagram.  *See* Hafetz Decl. ¶ 8-9, Exh. P-V.

military strengths.  Nor does DOD supply any rationale for how the date, place, or general circumstances of a detainee's capture could plausibly reveal something about intelligence the military has "gleaned" from a detainee or the intelligence that may have led to their capture. Furthermore, although the time, place, and general circumstances of a detainees' capture could conceivably reveal something about operations, the information is classifiable only if DOD demonstrates that those operations were *military* operations.  The Hood declaration is silent on this issue and it is not obvious:  it is well-established that some Bagram detainees were captured through non-military operations or were simply turned over to DOD by foreign security forces or local civilians, and thus were not captured as a result of U.S. operations at all.  *See* Hafetz Decl. ¶¶ 9.b, f; *id*. ¶ 9.g, Exh. V (article stating prisoner "captured by an Afghan warlord on Nov. 28, 2002 and delivered to Bagram by C.I.A. operatives two days later").

    B.  <u>DOD Has Not Shown that Disclosure of Basic Information About the Detainees is Likely to Cause Harm to National Security</u>.

Even if the Court were to find that some or all of the withheld information falls within a category of classifiable information, to prevail under Exemption 1, DOD must sufficiently demonstrate that disclosure of the withheld information "reasonably could be expected to result in damage to the national security."  Exec. Order 13,292 § 1.1.  At a minimum, DOD must show that there is a "logical connection" between the information withheld and the potential harm it fears.  *McDonnell v. United States*, 4 F.3d 1227, 1243 (3d Cir. 1993); *see also Wilner*, 592 F.3d at 73 (justifications must be "logical or plausible").  DOD has failed to meet this burden.

As an initial matter, DOD does not explain with specificity how release of each *particular* piece of information it withholds is likely to result in harm to national security.  The Hood declaration speaks categorically about the harm that might result from release of "the withheld information," Hood Decl. ¶ 6, "the information," *id*. "such information," *id*. ¶ 8, and "this type of information," *id.*, without making any effort to differentiate between the five

7

categories of information.  Such broad-brushed assertions are insufficient.  *See King*, 830 F.2d at 224 ("[c]ategorical description[s] of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate."); *Halpern*, 181 F.3d at 291-93.

Second, the Hood declaration barely describes (even categorically) the harms it invokes and provides no rationale for why those harms are *likely* to result from disclosure of the specific information withheld.  For example, Maj. Gen. Hood makes the bare assertion that disclosure of "this information" – without differentiation – would "impede intelligence operations" but does not explain how or why.  Hood Decl. ¶ 6.  The Hood declaration also makes the conclusory assertion that disclosure of any of the information "would aid" our enemies in "hiding their activities," "thwart[ing]" our efforts, or "evading capture."  *Id.* ¶ 7.  But it is left to the Court to guess how disclosure of a detainee's citizenship or length of detention – or even the date and place of their capture perhaps many years ago – could help our enemies do any of these things.  The Hood declaration also asserts that release of "such information" – again, without differentiation – would impede the military's ability to gather "human intelligence" because it could reveal who "has cooperated" with the military and "the information they provided."  *Id.* ¶ 8.  But how one could deduce which detainees have cooperated with the military, or the information they provided, from a detainee's citizenship, length of detention, or even the basic facts of their capture is left unexplained.  DOD has already released the names of each Bagram detainee but has failed to show how disclosing these other basic facts reasonably risks any of the alleged harms it invokes.  Again, this kind of "vague," "conclusory," and "categorical approach" is inadequate.  *Halpern*, 181 F.3d at 293.

In any event, DOD has not sufficiently demonstrated that disclosure of Bagram detainees' citizenship is likely to cause any of the harms it invokes.  Specifically, DOD has not shown how knowing a detainee's citizenship plausibly or logically risks helping our enemies

"evade capture" or "hid[e] their activities," or risks impeding the military's intelligence efforts. Hood Decl. ¶¶ 6-8.   More importantly, DOD's claim that harm would result from disclosure is contradicted by its own actions.   DOD has publicly confirmed the citizenship of specific Bagram detainees in the context of *habeas* litigation.   Hafetz Decl. ¶¶ 5, 9.a, Exh. C-F (confirming certain Bagram detainees are citizens of Yemen, Tunisia, and Afghanistan).   A DOD official recently stated publicly that "about 30" Bagram detainees were not Afghan citizens.   *Id.* ¶ 6, Exh. G.   Moreover, DOD has publicly released lists that contain the citizenship of similarly-situated suspected terrorists and combatants detained by DOD at Guantánamo.   *Id.* ¶ 10, Exh. W-Y. DOD disclosure of citizenship data about specific Bagram detainees and military detainees at Guantánamo strongly suggests that disclosure of this precise information here is not reasonably likely to cause the nation harm.   Where justifications for non-disclosure are "controvered by contrary evidence," they should not be afforded "substantial weight," and summary judgment is inappropriate.   *Wilner*, 592 F.3d at 68.

The same is true of a detainee's length of detention and date of capture.   There is no reason to believe that disclosure of this information even relates to the specific harms the government has identified, let alone reasonably risks causing them.   The length of each detainee's imprisonment reveals little about the detainee or the operation that led to their detention.   As discussed above, it does not even necessarily reveal when they were captured.   *See supra* at 6 n.3; *see also* Hafetz Decl. ¶¶ 9.b, f.   In any event, DOD itself has disclosed when specific detainees were captured; for example, a DOD press release states that Bagram detainee "Haji Abdul Majid Khan" was "detained March 3."   Hafetz Decl. ¶ 7, Exh. H; *see also id.* ¶ 7, Exh. H-O.   The length of time that some specific detainees have been held at Bagram, moreover, is public knowledge.   *See* Hafetz Decl. ¶ 9.a (ruling by Judge Bates discussing how specific Bagram detainees had been held for more than six years); *id.* ¶ 9.b (ruling by D.C. District Court

discussing how long former Bagram detainee held there).  The same is true of Guantánamo detainees – the length of each detainee's imprisonment is common knowledge as a result of DOD's own release of records from each detainee's administrative status review process, and disclosures in *habeas* litigation.  *Id.* ¶ 11, Exh. Z.  This undercuts the notion that public release of that information here is reasonably likely to cause harm.

The location and general circumstances of a detainees' capture is no different.  Although disclosure of this information might provide a miniscule amount of information about when or how a detainee came into U.S. custody – for example, that he was seized in a home raid in Kabul or during a neighborhood sweep in Jalalabad – it is far from evident how this information could reasonably teach our enemies how to *evade* capture or imperil the military's intelligence efforts.[4] In fact, DOD has publicly disclosed where some Bagram detainees were captured in the context of *habeas* litigation.  *Id.* ¶ 5, Exh. C-F (confirming detainees captured in specific cities in Pakistan or Afghanistan).  DOD has also frequently issued official press releases describing the date, location, and circumstances of capture of specific, named Bagram detainees.  *Id.* ¶ 7, Exh. H-I, L-O; *id.* Exh. J (DOD press release stating "Afghan National Army Commandos, assisted by Coalition forces, detained an insurgent leader, Abdul Wahid, and two militants, Raz Gul and Haider, in Behsood district, Nangarhar province, Dec. 17" during "a raid . . . on a compound serving as a transit point for various anti-Afghan Forces."); *id.* Exh. K ("Afghan National Commandos, assisted by Coalition forces, detained Taliban commanders Abdul Aziz and Abdul Rahman as well as one militant, Ishmail, during a security patrol in Jalalabad City . . . Dec. 15.");

---

[4] DOD provides no description of the "circumstances of capture" portion of the list.  It could well be that the description is so general that it reveals little or nothing that could reasonably be expected to cause harm.  The Court should review this information *in camera*.  *See Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987) ("[I]f the affidavits submitted by the parties are conclusory – if the documents and justifications for withholding are not described in sufficient detail . . . *in camera* review may be necessary to allow meaningful de novo review.").

*see also id.* ¶ 9.a-d, f-g, Exh. R-S, U-V (non-DOD sources describing the details capture of specific Bagram prisoners).  The DOD has also described the manner in which Bagram detainees are generally captured.  *See id.* ¶ 8, Exh. P-Q; *see also id.* ¶ 9.c-f, Exh. R-U (non-DOD reports describing ways Bagram detainees captured).  Bagram detainees, moreover, are free to disseminate details about where and how they were captured through their families.  Furthermore, DOD has released volumes of information about where, when, and in what circumstances Guantánamo detainees were captured – including how, under what general circumstances, and in what specific locations *in Afghanistan* they were seized.  *Id.* ¶ 11 (DOD records stating, for example, that a detainee was captured in "Kabul . . . by U.S. forces on 9 Dec 2001" and that another detainee "retreat[ing] . . . from Tora Bora to the Pakistani Border" was "captured by Pakistani Forces in December 2001").  This is precisely the limited type of information plaintiffs seek here.

Summary judgment in DOD's favor is not warranted because its claim that disclosure of each piece of data it withholds about the Bagram detainees is likely to result in harm to national security is not sufficiently substantiated and is contradicted by its own disclosures of this very information about both Bagram and Guantánamo detainees in other contexts.[5]

## II.    DOD HAS NOT MET ITS BURDEN TO JUSTIFY WITHHOLDING DETAINEES' FULL IDENTIFICATION NUMBERS UNDER EXEMPTION 2.

FOIA Exemption 2 permits an agency to withhold "internal agency information" if it "demonstrates that disclosure . . . would risk circumvention of lawful agency regulations." *Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993); *see also Wiesenfelder v. Riley*, 959 F. Supp. 532, 537 (D.D.C. 1997) (Exemption 2 applies where disclosure "significantly risk[s] providing the

---

[5] If the Court finds that DOD has sufficiently justified the withholding of some categories of information but not others, it should order DOD to release a less-redacted version of the list.  *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided").

11

subjects of regulations with information that could enable them to circumvent such regulations"). DOD has released to plaintiffs' each Bagram detainees' sequence or "SEQ" number, but has withheld each detainees' full registration or "ISN" number, invoking Exemption 2. *See* Hafetz Decl. ¶ 4, Exh. B; Hood Decl. ¶ 9.

DOD has not met its burden to demonstrate that disclosure of the detainees' ISN numbers in any way risks revealing information that would enable people to circumvent agency regulations or operations.  DOD's Exemption 2 claim rests entirely on a single sentence in the Hood declaration, which states that the ISN numbers contain "certain" details about the capture and detention of Bagram detainees and that disclosure "would hinder the effective performance of [DOD's] detainee operations at Bagram."  Hood Decl. ¶ 9.  DOD makes no effort to explain what kinds of "details" would be revealed, how its operations would be "hindered," or even what aspects of its "operations" would be affected, let alone illuminate how release of ISN numbers could inform people how to circumvent DOD operations.  Nor has DOD made any effort to explain why disclosure of detainees' full ISN numbers risks circumvention of its operations but release of the detainees' sequence number (which DOD has already disclosed) did not.   This bare and conclusory "justification" is plainly insufficient to meet the government's burden here. *See Linn v. Dep't of Justice*, No. 92-1406, 1995 WL 417810, *6 (D.D.C. June 6, 1995) (Exemption 2 withholding improper "absent an explanation of how [internal markings] relate to the internal practices and procedures of the [agency], and how their exposure would risk circumvention of any law."); *Halpern*, 181 F.3d at 293 (conclusory assertions insufficient).[6]

Moreover, the cases the government cites do not support its withholding of the ISN numbers.  Nearly all of the cases involved codes and numbers that would reveal confidential

---

[6] In its brief, the government asserts that the ISN numbers reveal "sensitive" information, Govt. Br. 23, but neither the Hood nor the Bragg declarations explain how or why.  It is worth noting, moreover, that DOD is not claiming that the ISN numbers are classified or reveal classified information.

informants.  *See Massey*, 3 F.3d at 622 (release of identification numbers would "compromis[e] the confidentiality of sources."); *Blanton v. Dep't of Justice*, 63 F. Supp. 2d 35, 43 (D.D.C. 1999) (same); *Linn*, 1995 WL 417810, *6 (same).  There is nothing in the government's submissions to suggest that disclosure of the detainees' full ISNs would reveal anything about confidential sources.  Summary judgment in DOD's favor on this issue is not warranted.

III.    CIA HAS NOT MET ITS BURDEN TO JUSTIFY ITS REFUSAL TO PROCESS PLAINTIFFS' FOIA REQUEST.

Plaintiffs seek from the CIA records about the rendition or transfer of detainees to Bagram (Request #6) and the interrogation and treatment of detainees (Request #10).[7]  The CIA has refused to even process plaintiffs' request, claiming that the mere fact that it may possess such records is exempt from disclosure under FOIA Exemptions 1 and 3.

The CIA is "not exempted from responding to a FOIA request."  *ACLU v. Dep't of Def.*, 396 F. Supp. 2d 459, 462 (S.D.N.Y. 2005).  The CIA can evade its FOIA obligation only in an exceptionally limited circumstance: where a "FOIA exemption would itself preclude . . . acknowledgment" that the records sought do or do not exist.  *Wilner*, 592 F.3d at 75; *see also Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (Glomar[8] response justified only where the "fact of the existence or nonexistence of agency records falls within a FOIA exemption").

The same burdens and standards of review that apply to traditional exemption claims apply to Glomar claims as well.  *Wilner*, 592 F.3d at 68.  The CIA must provide "a detailed affidavit showing that the information [it refuses to confirm or deny] logically falls within the claimed exemptions."  *Id.*  Conclusory, vague, or sweeping justifications will not suffice.

---

[7] As to the CIA, plaintiffs withdraw Requests #1-5 (basic facts about people currently detained at Bagram), #7-9 (U.S. and Afghan government agreements), and #8 (status review process records).  DOD has provided a record that contains (albeit in redacted form) the information plaintiffs sought through Request #1-5 and plaintiffs have already withdrawn this aspect of the request from DOJ and the State Department.  Requests #7, #8, and #9 were directed primarily to the other agencies.

[8] The refusal to acknowledge the existence of records is known as a "Glomar" response.

*Larson*, 565 F.3d at 864.  The affidavit is afforded "substantial weight" only if the "justifications for nondisclosure are not controverted by contrary evidence."  *Wilner*, 592 F.3d at 68.  Careful scrutiny of Glomar claims is especially important because the result is radical:  the CIA can escape its FOIA obligations entirely.  Glomar responses, moreover, are particularly susceptible to abuse.  *ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547, 561 (S.D.N.Y 2005) ("[t]he danger of Glomar responses is that they encourage an unfortunate tendency of government officials to over-classify information, frequently keeping secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods").

A.  <u>Exemption 1 Does Not Supply a Valid Basis for Refusing to Process the Request</u>**.**

1.  <u>CIA's Exemption 1 Claim is Insufficiently Justified.</u>

The CIA has not met its burden to explain with specificity why disclosure of the mere fact that it may or may not possess records responsive to Request #6 or #10 is likely to cause harm to national security and thus withholdable under Exemption 1.  In fact, the CIA's declaration does not even mention these categories of records.  Every specific example of why processing the request would purportedly reveal a properly classified fact pertains to other aspects of the request.  *See* Declaration of Wendy Hilton ("Hilton Decl.") ¶¶ 16-20, 40-41 (discussing harm that would flow from processing Requests #1-5, #7, and #9).

Nor has CIA explained why it cannot acknowledge whether it has policy documents about rendition or treatment of detainees.  The CIA has not only processed but disclosed records in response to other FOIA requests about the CIA's rendition, interrogation, and detention policies *and* practices, both generally and in Afghanistan.  Goodman Decl. ¶¶ 44-50.

Moreover, the justifications the CIA does provide are bare, conclusory, and categorical. For example, the CIA makes the bare assertion that it cannot process the request because it cannot acknowledge where it "operates," Hilton Decl. ¶ 11, but does not explain why, or how

acknowledging it operates in this particular location would cause harm (a striking failure given how openly the CIA operates in the area).  *See infra* at 19-24.  The CIA categorically asserts that it can never reveal its "methods" or "tools," Hilton Decl. ¶ 36, but does not explain how acknowledging its use of these particular methods or tools would cause harm (also a striking omission given the CIA has acknowledged its rendition and interrogation methods).  *See infra* at 16-19.  Furthermore, most of the CIA's assertions are premised on hypothetical harms that would flow from acknowledging information that merely processing the request *would not require the CIA to acknowledge,* such as its interest, or lack thereof, in specific detainees.  Hilton Decl. ¶ 16-19, 35.  Processing the request would not require the CIA to reveal *anything* about particular detainees; it remains free to withhold this information, if appropriate, during production.

Summary judgment in the CIA's favor is unwarranted for these reasons alone.  *See El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 315 (D.Conn 2008) (rejecting Glomar response where affidavits did not provide "sufficient evidence to review, *de novo* . . . [whether] the existence of [particular] records [was] classified"); *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (rejecting CIA Glomar claim that was not substantiated with "reasonably specific detail"); *see also Halpern*, 181 F.3d at 293.

    2.  <u>CIA's Exemption 1 Claim is Contradicted by Contrary Evidence</u>.

The CIA's claim that acknowledging whether it possesses records responsive to Request #6 or #10 would reveal a classified fact whose disclosure is likely to harm national security is contradicted by volumes of contrary evidence that show that the CIA's rendition or transfer of suspected terrorists to U.S. military custody at Bagram, and its interrogation of prisoners there, is publicly-acknowledged and well-known.  This evidence strongly suggests that merely processing plaintiffs request would not reveal any secrets at all, let alone a secret whose disclosure would

harm national security.  Thus, summary judgment in the CIA's favor is unwarranted, and its declaration should not be afforded substantial weight.

> a. Merely Processing Requests #6 or #10 Would Not Reveal Secret Intelligence Methods, Tools, or Activities.

The CIA asserts that merely acknowledging its possession of records about rendition or interrogation would reveal a classified "method," "tool," or "intelligence activit[y]."  Hilton Decl. ¶ 31, 36.  To the contrary, the CIA's rendition practice – capturing suspected terrorists and transferring them to U.S. or foreign custody in another country – is an acknowledged tool in the CIA's intelligence-gathering arsenal.  Goodman Decl. ¶¶ 11-16.  According to former CIA Director Hayden, renditions involve "moving a terrorist from A to B" or "from one country to another."  *Id.* ¶ 12.a-b, Exh. AC-AD.   The CIA is the main agency tasked with this role.  *Id.* ¶ 11.   The CIA's rendition program has been officially acknowledged by, among others, current and former Directors of the CIA, President Obama, and former President Bush, *id.* ¶12, Exh. AC-AM, Director Hayden publicly disclosed the number of people rendered, *id.* ¶ 16.a, Exh. AC, and the CIA has released documents that describe the rendition process in chilling detail, *see id.* ¶ 13, Exh. AN ("During the flight, the detainee is securely shackled and is deprived of sight and sound through the use of blindfolds, earmuffs, and hoods" and the process is designed to maximize the "potential dread [he] might have of U.S. custody.").

More importantly here, the CIA's practice of transferring people it captures *to U.S. military custody abroad* is also acknowledged.  A public memorandum from the Office of Legal Counsel to the CIA confirms that, even when the CIA operated its own detention program, once it obtained the intelligence it needed, "the CIA intend[ed] to transfer the detainee to the custody of other entities, including the . . . Department of Defense." Goodman Decl. ¶ 14.a, Exh. AO; *see also id.* ¶ 14.b-f, Exh. AE, AP-AR (official announcements of detainee transfers from CIA to military custody at Guantánamo); *see infra* at 21-22 (official disclosures about detainees

16

transfers from CIA to military custody in Afghanistan).  Now that the CIA's detention program has been banned and CIA prisons closed, *id*. ¶¶ 41-45, CIA Director Panetta has confirmed that the CIA will continue to capture suspected terrorists abroad, but will now "*quickly turn over any person in [its] custody to U.S. military authorities* or to their country of jurisdiction." *Id*. ¶ 14.f, Exh. Q (emphasis added).

The CIA's practice of interrogating suspected terrorists and combatants abroad is similarly acknowledged and publicly-known.  President Bush, President Obama, and current and former CIA Directors, among others, have acknowledged that the CIA operated its own program to detain and interrogate suspected terrorists and combatants, Goodman Decl. ¶ 23, and that CIA interrogations were governed by different rules, *id*. ¶ 23.a, Exh. AE.  In fact, the CIA and DOJ have publicly disclosed an astonishing amount of information about this method or activity, including the number of prisoners; names of many detained; typical procedures for capturing, rendering, and processing prisoners; conditions of confinement at CIA prisons; and specific intelligence gleaned from specific detainees.  *See id*. ¶ 24, Exh. T, AC, AO, BI, BJ.  The CIA and DOJ have also disclosed records that describe in shocking detail the CIA's brutal "enhanced interrogation techniques" such as waterboarding, confinement in a box (with insects), wall-slamming, prolonged stress positions, and lengthy sleep deprivation – both generally and as-applied to particular detainees.  *Id*. ¶ 24, Exh. T, AG, AN, BK-BO.

But not all CIA interrogation activity occurred at CIA prisons.  The CIA has acknowledged that some interrogations occurred at military bases abroad.  *See* Goodman Decl. ¶ 26.a, Exh. T (CIA Inspector General discussing CIA's role in interrogation-related "death of a detainee at a military base in Northeast Afghanistan"); *id*. ¶ 26.b-c.  Numerous public DOD sources discuss CIA interrogation activity at DOD facilities.  *See id*. ¶ 28.a-b; *id*. ¶ 28.d-f, Exh.

BS-BU (DOD briefings discussing the need to "enforce adherence by OGA[9] with established DoD [rules] while conducting detainee interrogation operations at DoD facilities," and that "guidance [was] required where multiple agencies (e.g. DoD, FBI, CIA) perform joint/combined interrogations"); *id.* ¶ 28.c, Exh. AX (DOD Church Report finding "DoD and OGA personnel did conduct joint interrogations at DoD facilities," and quoting DOD staff saying the "CIA" had to follow DOD rules when "conducting interrogations . . . at a DoD facility"); *id.* (Church Report finding DOD provided CIA "facilities for interrogation"); *id.* ¶ 30.a (Church Report finding that DOD held "ghost detainees for the CIA"); *id.* ¶ 32.a, Exh. AZ (DOD Fay Report finding "CIA conducted unilateral and joint interrogation operations at Abu Ghraib"); *id.* ¶ 33, Exh. BZ (DOD Directive setting rules for "non-DOD personnel" who interrogate prisoners in DOD facilities); *see also infra* at 22-23 (discussing CIA interrogations at DOD facilities in Afghanistan).[10]

CIA Director Panetta has confirmed that the CIA will continue to interrogate suspected terrorists abroad; the CIA will simply no longer use "enhanced interrogation techniques" that are now banned.  *See* Goodman Decl. ¶ 27.a, Exh. Q ("CIA officers . . . will continue to conduct debriefings"); *id.* ¶ 42.c, Exh. DA ("we will adhere to the Army Field Manual for interrogation"). Indeed, it is now even more likely that the CIA will conduct interrogations at military detention facilities since it can no longer do so at CIA prisons, which have been closed.

---

[9]  DOD investigators have confirmed that "OGA" or "Other Government Agency" in the detention/interrogation context means the CIA.  *See* Goodman Decl. ¶ 17.a, Exh. AY (Vice Admiral Church stating, "I was tasked to . . . look at how DOD interfaced with the OGA, which is primarily CIA"); *id.* ¶ 17.b, Exh. AX (Church Report stating that OGAs were "federal agencies other than DoD that have specific interrogation and/or detention-related missions in the Global War on Terror," "includ[ing] the Central Intelligence Agency," and that Church investigation "focused primarily on DoD support to the CIA"); *id.* ¶ 17.c, Exh. AZ (DOD Fay Report stating that OGA referred "almost exclusively to the CIA.").

[10]  Indeed, the Fay Report concluded that the "CIA's detention and interrogation practices" at military bases and the "perception that non-DOD agencies had different rules," "led to a loss of accountability" and "poisoned the atmosphere" at Abu Ghraib.  Goodman Decl. Exh. AZ.

Thus, both the CIA's rendition/transfer of suspected terrorists to U.S. military custody, and its interrogation of such individuals at military facilities abroad, are methods and activities that have been acknowledged – repeatedly – by the CIA and DOD.  Where a piece of information is already officially-disclosed, an agency cannot refuse to confirm or deny it under FOIA.  *Wilner*, 592 F.3d at 68; *Wolf*, 473 F.3d at 378-79.  In any event, these disclosures contradict the CIA's claim that acknowledging its mere possession of records can reasonably be expected to harm national security.  *See United States v. Marchetti*, 466 F.2d 1309, 1313 (4th Cir. 1972) (no legitimate government interest in censoring "information which is . . . officially disclosed"); *Wash. Post v. Dep't of Def.*, 766 F. Supp. 1, 9 (D.C. Cir. 1991) ("[T]he presence of information in the public domain makes the disclosure of that information less likely to 'cause damage to the national security.' . . . [I]f the information has already been disclosed and is so widely disseminated that it cannot be made secret again, its subsequent disclosure will cause no *further* damage." (emphasis in original)).

> ### b.   Merely Processing Requests #6 or #10 Would Not Reveal a Secret Location of CIA Activity.

The CIA claims that acknowledging it may possess responsive records would reveal a classified fact about where the CIA "operates."  Hilton Decl. ¶¶ 11, 32.  As an initial matter, however, Afghanistan – a major U.S. war zone and the main hub of U.S. counter-terrorism efforts – is by no means a secret locus of CIA activity.  The CIA has proudly, and quite publicly, touted its central and active role in counter-terrorism and intelligence operations there.  *See* Goodman Dec. ¶ 3, Exh. A-G; *id.* ¶ 5.a, Exh. N (Former CIA Director Hayden stating that the "CIA has been an integral part of U.S. operations in Afghanistan since the start of the conflict there"); *id.* at ¶ 3.d-e, Exh. D-E (CIA Director Panetta stating the CIA is "involved in . . . the war zones directly," and that it "leads" and "is at the center of" the fight against terrorists in Afghanistan).  Former CIA Director Hayden and CIA Director Panetta have acknowledged the

existence of CIA bases and stations in Afghanistan.  *Id.* ¶ 6, Exh. R-T.  CIA Directors have also
confirmed the deaths of CIA agents operating in Afghanistan.  *Id.* ¶ 4, Exh. B, H-M.

The CIA's acknowledgments are not merely abstract.  To the contrary, the CIA has
described openly its core operational function to capture, interrogate, and glean intelligence from
suspected terrorists and combatants in Afghanistan.  *See, e.g.*, Goodman Decl. ¶ 5.a, Exh. N
(former CIA Director Hayden stating that CIA officers "pursue," "capture," and "remove from
the battlefield," "al-Qa'ida and Taliban leadership targets in Afghanistan"); *id.* ¶ 5.c, Exh. P
(former CIA Director Tenet discussing CIA "arrests and raids" in Afghanistan); *id.* ¶ 5.e, Exh. E
(CIA Director Panetta stating that CIA "takes off the battlefield . . . [p]eople on whom al-Qa'ida
once relied"); *id.* ¶ 3.c , Exh. C (former CIA Director Tenet discussing CIA's "intelligence
support" to military in Afghanistan); *id.* ¶ 3.f, Exh. F (CIA Director Panetta stating that the CIA
"gather[s] information to destroy [al-Qaeda's] networks and disrupt its operations" in
Afghanistan); *see infra* at 22 (discussing CIA disclosures about interrogations in Afghanistan).

More importantly, the CIA has acknowledged its presence at military bases in
Afghanistan.  According to former CIA Director Hayden:  "The cooperative spirit is strongest in
. . . the war zones.  I've been to Iraq and Afghanistan several times, and there is little if any
partitioning or sense of turf . . . . At any one of our Stations or forward bases you not only find
CIA analysts working closely with CIA case officers, but both serve alongside . . . uniformed
military."  Goodman Decl. ¶ 6, Exh. S; *see also id.*  ¶ 5.c, Exh. T; *id* ¶ 26 (CIA disclosures about
its role in detainee deaths at military bases in Afghanistan).

Accordingly, it is no surprise that the CIA's presence at Bagram – the U.S.
government's main base of operations and the site of its largest detention facility in Afghanistan
– is by no means a secret either.  According to former Director of National Intelligence J.
Michael McConnell, "you go to . . . Bagram . . . it is filled with people.  You don't know one

from the other – FBI, CIA, NSA, NGA.  And they are all moving and grooving.  They have an

expectation of sharing.  They have an expectation of having access."  Goodman Decl. ¶ 7, Exh.

V; *see also infra* at 21-24 (discussing official and public disclosures about CIA's rendition and

interrogation activity at Bagram); *id.* ¶ 10.a, Exh. Y (L.A. Times article reporting that "[o]ne of

the largest concentrations of CIA personnel is at Bagram air base").

More specifically, official sources have confirmed that the CIA has rendered or

transferred detainees to military custody in Afghanistan.  Indeed, the CIA itself has implicitly

acknowledged as much.  As discussed above, the CIA has acknowledged that it has transferred

and will continue to transfer people it captures to military custody.  *See supra* at 16-17.  It

appears that the only place the U.S. is detaining new prisoners is in Afghanistan; the military

detains prisoners at Guantánamo and in Iraq, but given its efforts to close Guantánamo and

transfer detention operations to the Iraqis, it does not seem that the military is taking custody of

new prisoners in those places.  Goodman Decl. ¶ 15, Exh. AT-AV.  Thus, any future CIA

transfers to military custody would be, by definition, to Afghanistan.

In any event, the CIA's past transfer of detainees to military custody in Afghanistan, and

Bagram in particular, has been confirmed by DOD.  For example, the Jacoby Report – a DOD

report on detention problems in Afghanistan – confirms that detainees were brought to DOD

facilities, including Bagram, from "multiple U.S. agencies," and that they were "often accepted

from non-DOD sources," like the CIA.  Goodman Decl. ¶ 16.a, Exh. AW; *see also id.* (finding

transfers from other agencies problematic because "detainees [would] have the opportunity to tell

their story to the ICRC," and DOD would "be left trying to explain any allegations of abuse or

maltreatment").  The Church Report, which examined detention issues in, among other places,

Afghanistan, concluded that one of DOD's problems was the "transfer of detainees to or from OGAs" and the use of "military escort[s] for [OGA] detainees." *Id.* ¶ 16.b, Exh. AX.[11]

The CIA's interrogation of suspected terrorists and combatants at military facilities in Afghanistan, including Bagram, is equally acknowledged.  The CIA itself has admitted its complicity in interrogation-related deaths at military bases in Afghanistan. *See, e.g.*, Goodman Decl. ¶ 26.a, Exh. T (CIA Inspector General report); *id.* ¶ 26.b-c (CIA publicly discussing conviction of CIA contractor in death of detainee in U.S. base in Asadabad, Afghanistan).

According to DOD sources, the CIA has been at Bagram since the inception of Operation Enduring Freedom as part of a joint task force that "operat[ed] Afghanistan's main interrogation facility in Bagram" and "det[ained] and interrogat[ed]" terrorists.  Goodman Decl. ¶ 28.b, Exh. BR; *id.* ¶ 28.e, Exh. BQ.  DOD sources confirm that CIA interrogation activity continued at Bagram and other military bases in Afghanistan.  The DOD Church Report concluded, for example, that in "work[ing] together . . . to support their common intelligence collection mission" in "Operation Enduring Freedom," *id.* ¶ 28.c, Exh. AX, CIA and DOD "conduct[ed] joint interrogations at DoD facilities," *id.*; DOD provided "oversight and support of OGA interrogations in DOD facilities" and "facilities for [CIA] interrogations," *id.*; DOD held "ghost detainees for the CIA"), *id.* ¶ 30.a; and there were no "policies governing the interaction of DOD interrogators and CIA," *id.* ¶ 28.c; *see also id.* 28.d (DOD briefing noting need for guidelines for when "DoD, FBI, CIA [ ] perform joint/combined interrogations" at DOD facilities in Iraq and Afghanistan); *id.* ¶ 28.g-h, Exh. BV-BW.   Recently, Representative Mike Rogers publicly discussed how, during a trip to Bagram, he joined a "regular morning meeting of FBI, CIA, [and] Defense Department . . . personnel involved in interrogations."  *Id.* ¶ 29, Exh. BX.

---

[11] Again, Church Report references to "OGA" generally mean the CIA. *See supra* 17 n. 9.

Thus, the fact that the CIA "operates" in Afghanistan and at Bagram, and even that it transfers/renders and interrogates prisoners *in this particular location*, has already been disclosed by the CIA, DOD, and other officials. These official disclosures preclude the CIA from refusing to even acknowledge whether it possesses responsive records here, *see Wilner*, 592 F.3d at 68, and contradict the CIA's claim it would harm national security merely to reveal that the CIA has "operated" at Bagram, *see Wash. Post*, 766 F. Supp. at 9; *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 772 (D.C.N.Y. 1979) (FOIA "would be thwarted if information remained classified" even after it had been "specifically revealed").

The CIA's transfer of detainees to Bagram, and its interrogation (and abuse) of prisoners there, is, moreover, widely-known. Two investigatory reports issued by the Council of Europe conclude that "CIA detainees are known to have been held at facilities such as Bagram both before and after having been subjected to rendition," and discuss CIA renditions of specific detainees to Bagram. Goodman Decl. ¶ 20.a-b, exh. BB-BC. The U.N. Human Rights Council recently released a report that came to the same conclusion, citing approximately one dozen examples of people known to be rendered from CIA prisons to Bagram. *Id.* ¶ 21. The press has reported widely on CIA renditions to Bagram as well. *See* ¶ 22; *id.* ¶ 22.b, Exh. BF (N.Y. Times article reporting that, according to "military officials," some Bagram prisoners were "previously held by the CIA in secret interrogations centers in Afghanistan and other countries."). The U.N. Human Rights Council report discusses a particular Bagram detainee who was "interrogated by FBI [and] CIA," who described being "stripped naked," "beaten," and "sexually abused." Goodman Decl. ¶ 37.a, Exh. BD; *see also id.* ¶ 37.b-g (media reports of CIA abuse at Bagram).[12]

---

[12] Abuse of prisoners at Bagram, more generally, has been documented in public DOD and FBI records, *id.* ¶ 39, and by international bodies, human rights organizations, and the press, *id.* ¶ 40.

It is also widely-reported that one of the CIA's infamous prisons was located at Bagram. *See* Goodman Decl. ¶ 34.  Investigations by international bodies have corroborated these reports. *Id.* ¶ 35, Exh. BB (Council of Europe finding that "among the most highly-populated and well-known of these [CIA] detention sites" was "at the Bagram Airfield"); *id.* ¶ 36, BD (U.N. Human Rights Council discussing the CIA's "secret prison within the Bagram airbase").

Where, as here, an agency seeks to withhold information that is already in the public domain, it must specifically explain how additional disclosure or confirmation could damage national security.  *See Wash. Post*, 766 F. Supp. at 9. The CIA, however, has not done so here. Given the voluminous public disclosures about the CIA's presence in Afghanistan and Bagram, and its rendition and interrogation activity there, the CIA's bare assertion that acknowledging the mere fact that it possesses records about this location would harm national security does not suffice.  *See id.*; *ACLU v. Dep't of Def.*, 396 F. Supp. 2d at 462 (rejecting Glomar claim where acknowledging existence of a document would "add[ ] nothing to, and detract[ ] nothing from, the public understanding" of CIA activities).[13]

          c.   Merely Processing Request #6 or #10 Would Not Reveal Secret CIA Sources or Targets.

The CIA repeatedly claims that merely acknowledging that it may possess responsive records would reveal classified information about particular "sources" or "targets."  Hilton Decl. ¶ 16, 18.  Merely processing the request for records (particularly pure policy records), however, would not require the CIA to reveal *anything* about particular detainees.  Yet nearly every

---

[13] To the extent the CIA rests its Exemption 1 claim on the bare assertion that merely acknowledging that it may possess responsive records would cause harm to foreign relations, Hilton Decl. ¶ 42, this argument is particularly unpersuasive in the context of Afghanistan (where the U.S. government is openly fighting a war and conducting counter-terrorism operations with the full approval of the Afghan government) and Bagram (where the U.S. is detaining individuals with the blessing of the Afghan government, in a place where the Afghan government has ceded to the U.S. exclusive jurisdiction and control).  The Afghan government, like any member of the U.S. public, is well-aware that detainees at Bagram are being transported, interrogated, and detained there by the U.S. government, and that the CIA has an active and publicly-acknowledged partnership with the DOD in such matters.

specific example the CIA provides for the harm that could result from processing (with the exception of those that pertain to acknowledging agreements with the Afghan government, which are not relevant in light of plaintiffs' withdrawal of those requests) involves the revelation of records about *particular* detainees.  *See, e.g.*, Hilton Decl. ¶¶ 16-19, 35.  In this regard, the CIA spends most of its declaration battling a straw man.

To be sure, records responsive to plaintiffs' request may *contain* information about specific sources or targets, but the CIA is free to withhold such information, if appropriate, during the production process.  *See, e.g.*, *Berman v. CIA*, 501 F.3d 1136, 1146 (9th Cir. 2007) (finding that CIA Presidential Daily Brief may "contain information that reveals intelligence sources" the mere existence of the Daily Brief was not a withholdable fact); *ACLU v. Dep't of Def.*, 396 F. Supp. 2d at 462 (rejecting Glomar claim where CIA's concerns about disclosure of sources and methods could be addressed by exemption claims during the production process). This is exactly what the CIA has done when it has processed other FOIA requests about its rendition and interrogation activity.  *See* Goodman Decl. ¶¶ 44-49.

To the extent CIA asserts that it cannot acknowledge whether or not it has an "intelligence interest" in Bagram detainees, more generally, Hilton Decl. ¶¶ 11, 14, this argument fails because, as discussed extensively above, the CIA's general "interest in" this pool of detainees is acknowledged and well-known.  Thus, the CIA's claim is contradicted by other evidence and should not be afforded substantial weight.  *Wilner*, 592 F.3d at 68

But just as importantly, the rationale the CIA supplies for why it cannot acknowledge whether or not it has a general "intelligence interest" in Bagram detainees does not meet the test of "logic[ ] and plausib[ility]."  *Wilner*, 592 F.3d at 73.  The CIA claims that if forced to acknowledge it does *not* have records about Bagram detainees generally, it would reveal a "gap" in its intelligence capacity and "reveal potential[ ] safe havens in which our adversaries might

25

operate." Hilton Decl. ¶ 32.   It is unlikely in the extreme, however, to think that one might

consider Afghanistan or the U.S. detention facility at Bagram to be a "saf[e] haven" where

terrorists are free to operate if it is only the military, and not the CIA, capturing, transferring,

detaining, and interrogating them there.   Moreover, the CIA has made no effort to explain how

harm could result from its mere acknowledgment that, at some point over the last nine years, it

may have looked to an unidentified class of suspected members of al-Qaeda and the Taliban who

were *already in U.S. custody* as a potential source of information.[14]   The CIA is entitled to

deference but its justifications for non-disclosure must be sufficiently explained, logical, and

plausible.  *Wilner*, 592 F.3d at 73; *Halpern*,181 F.3d at 293.

Finally, even assuming that the CIA was correct that merely processing the request would

require it to reveal something about particular detainees (which it does not), the rationales the

CIA supplies for non-disclosure do not withstand scrutiny as applied to this particular group of

people.  For example, the CIA asserts that acknowledging an interest in particular detainees

would "undermine their intelligence value" because al-Qaeda will "assume he or she is

compromised" and "alter [its] operations."  Hilton Decl. ¶ 17.   Bagram detainees, however, are

already known to be compromised by virtue of the fact that they are *already known to be in U.S.

custody*.  Whether it is the CIA or the military that captured, detained, or interrogated them at

Bagram seemingly makes no difference in this regard.  Moreover, the CIA's claim that it can

never acknowledge its interest in particular detainees is undercut by the fact that it has

acknowledged its "interest" in, and its rendition, interrogation, and detention of, specific, *named*

suspected terrorists on numerous occasions.  *See* Goodman Decl. ¶ 24.b-l.  In any event, the

---

[14] Moreover, as discussed below, *see infra* at 28-29, the case law the government cites does not
support the proposition that Bagram itself is a protectable "source" at all.  The cases upon which the
government relies pertain to the withholding of information about particular individual sources.

weaknesses of the CIA's justifications are irrelevant because merely processing the request will not require the CIA to acknowledge anything about its interest in particular detainees.

In sum, the mere fact that the CIA may or may not possess records responsive to Request #6 or #10 is not a properly classified secret whose disclosure is reasonably likely to cause harm to national security.  Exemption 1 does not supply a valid basis for the CIA's Glomar response.

B. Exemption 3 Does Not Supply a Valid Basis for Refusing to Process the Request.

FOIA Exemption 3 applies to records "specifically exempted from disclosure by statute." *Wilner*, 592 F. 3d at 71.   The CIA relies on two statutes here: 50 U.S.C. § 403-1(i)(1), which provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure"; and 50 U.S.C. § 403g, which provides that "to further implement" the "Director of National Intelligence['s] responsibil[ity]" to protect sources and methods, the "Agency shall be exempted from . . . any other law which require[s] . . . disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel."  The CIA has not met its burden to demonstrate that the mere existence or non-existence of records responsive to Request #6 or #10 is withholdable information under either of these statutes.

First, the CIA's Exemption 3 claim is procedurally defective.  In 2004, Congress restructured the intelligence community.  *See* Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108-458.   Among other things, Congress created the Director of National Intelligence ("DNI") to oversee all intelligence agencies (including the CIA), and, through 50 U.S.C. § 403-1(i)(1), shifted the responsibility to protect disclosure of sources and methods from the CIA Director to the DNI.  *See* H. Conf. Rep. 108-796 § 1011.  Similarly, Congress amended 50 U.S.C. § 403g to make clear that it was intended to "further implement[ ] . . . the "Director of National Intelligence['s] responsibil[ities]."  The IRTPA also provides that the DNI "may only delegate a duty or authority . . . to the Principal Deputy Director of National

Intelligence," not the CIA.  50 U.S.C. § 403-1(i)(3).  Thus, the DNI, not the CIA, must invoke,

and submit a declaration supporting, the withholding of information under these statues.[15]

Second, the CIA has not demonstrated that the mere fact that it may or may not possess

responsive records falls within the purview of these statutes.  With respect to 50 U.S.C. § 403-

1(i)(1), merely acknowledging that the CIA may possess records about rendition or interrogation

would not require the CIA to reveal a protectable intelligence method.  As discussed above, these

methods – and the fact that the CIA has *employed* these methods in Afghanistan and at Bagram –

have been acknowledged.  *See supra* at 16-17, 21-23.  The CIA cannot rely on 50 U.S.C. § 403-

1(i)(1) to withhold the mere fact that it may possess records about methods it has already

disclosed.  *See Wolf*, 473 F.3d at 379.  Moreover, the CIA's processing of other FOIA requests

about its rendition and interrogations methods, Goodman Decl. ¶¶ 44-50, undercuts the CIA's

assertion processing this request would reveal a protectable method.[16]

Similarly, merely acknowledging that the CIA may possess records about rendition or

interrogation policies and practices at Bagram would not require the CIA to reveal anything

about specific intelligence sources.  *See supra* at 24-27.  Any information about particular

sources could be withheld, if appropriate, during the production process.  *See id.*

To the extent the CIA is arguing that Bagram itself is a "source," the CIA and DOD have

already disclosed that suspected members of al-Qaeda and the Taliban, including those in U.S.

---

[15] The government cites *Larson*, 565 F.3d 857 for the proposition that the CIA may still invoke
the DNI's authority.  Gov't Br. 15 n.11.  In that case, however, plaintiffs never raised, and the court did
not analyze, whether it is the DNI who must now invoke, and support withholdings under, these statutes.
To plaintiffs' knowledge, no court has ever directly addressed this question.

[16] The government suggests, Govt. Br. 18-19, that the CIA can withhold even well-known
intelligence methods.  It relies on two cases in which the courts rejected the argument that the CIA was
foreclosed from withholding records about intelligence methods just because they were, "basic,"
*Fitzgibbon v. CIA*, 911 F.2d 755,762 (D.C. Cir. 1990), "simpl[e]," or obvious, *Schoenman v. FBI*, 2009
WL 763065, *25 (D.D.C. Mar. 19, 2009).  But the question here is not whether the CIA can withhold
records about merely obvious or generally-known methods, but rather methods the CIA itself has
officially disclosed.  Nothing in the cases the government cites suggests that the CIA may withhold
records about methods it has already acknowledged.

custody, are a potential "source" of CIA intelligence.  *See supra* at 19-23.  More generally, however, the assertion that Bagram generally is a protectable "source" is not supported by the case law the government cites, nearly all of which concerns the withholding of information about *particular*, individual sources.[17]  Indeed, in the vast majority of these cases, the CIA did not even provide a Glomar response but rather processed the request and withheld particular records or information.  The CIA's claim here is much more radical.

Finally, with respect to 50 U.S.C. § 403g, the CIA's bare assertion, without more, that processing plaintiffs' request would reveal something about its "core function" of "intelligence collection" does not suffice to meet the CIA's burden under Exemption 3.  *Cf. Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979) (holding "[b]arren assertions that an exempting statute has been met cannot suffice" and rejecting explanation that "fail[ed] to indicate even in the slightest how [specific] agency functions might be unveiled"); *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56, 73 (D.D.C. 2007).  More fundamentally, the statute's reference to "functions" does not "allow[ ] the [CIA] to refuse to provide any information at all about anything it does"; rather, it exempts the CIA from disclosing things like "its internal structure."  *Phillippi v. CIA*, 546 F.2d 1009, 1015 n.14 (D.C. Cir. 1976).[18]  In any event, the CIA's "function" of capturing suspected terrorists, interrogating them to

---

[17] *See CIA v. Sims*, 471 U.S. 159, 163-65(1985) (permitting withholding of "names" and "institutional affiliations" of "all individual[s]" involved in secret CIA research project because the "these persons provided, or were engaged to provide, information" to the Agency); *Hunt v. CIA*, 981 F.2d 1116, 1117 (9th Cir. 1992) (FOIA seeking records about a particular foreign national); *Fitzgibbon*, 911 F.2d at 757 (same); *Wolf*, 473 F.3d at 372 (same); *Rubin v. CIA*, 2001 WL 1537706, *1 (S.D.N.Y. 2001) (same); *Sirota v. CIA*, 1981 WL 158804, *1 (S.D.N.Y Sept. 18, 1981) (FOIA for records about a particular foundation alleged to be a CIA cover); *Wilner*, 592 F.3d at 64 (FOIA for records about particular lawyers targeted by the NSA); *cf. Berman*, 501 F.3d at 1146.

[18] To the extent that the government cites cases that interpret "function" to encompass "intelligence sources and methods," Govt. Br. 17, the CIA's claim fails regardless.  As discussed above, unlike in *Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978) (methods), *Makky v. Chertoff*, 489 F. Supp. 2d 421 (D.N.J. 2007) (methods, activities, or internal components/locations), and *Earth Pledge Found. v.*

glean intelligence, and transferring them to military custody – and that it engages in these functions in Afghanistan and at Bagram – has been officially disclosed.  *See supra* 16-17, 19-23.

In sum, the CIA's Exemption 3 claim is procedurally defective, is contradicted by contrary evidence, and is not supported by the case law the government cites.  To the extent that any responsive records actually contain information about protectable sources, methods, or functions, the CIA's concerns can be amply accommodated by invoking exemptions during the production process.  But the mere fact that the CIA may or may not possess responsive records is not a protected source, method, or function exempt from disclosure under Exemption 3.[19]

## CONCLUSION

For these reasons, plaintiffs respectfully urge the Court deny the government's motion for partial summary judgment, and grant plaintiffs' cross-motion for partial summary judgment.

Respectfully submitted,

  s/ Melissa Goodman
MELISSA GOODMAN (MG-7844)
JONATHAN HAFETZ (JH-0843)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-549-2500
Fax: 212-549-2629

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENGBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, New York 10004

March 10, 2010

---

*CIA*, 988 F. Supp. 623 (S.D.N.Y. 1996) (sources and methods), merely processing plaintiffs will request will not require the CIA to reveal protectable sources or methods.

[19] To the extent the CIA's Exemption 3 argument rests on its refusal to confirm the existence of records about torture or secret detention, its Glomar response is inappropriate.  In *Sims*, 471 U.S. 159, the Supreme Court made clear that the CIA may withhold information about only those sources or methods that "fall within the Agency's mandate."  Because torture and CIA secret detention have been banned and discontinued, they are outside of the Agency's mandate and are not protectable "sources and methods."