UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>     Plaintiffs,<br><br>  v.<br><br>DEPARTMENT OF DEFENSE; CENTRAL INTELLIGENCE AGENCY; DEPARTMENT OF STATE; DEPARTMENT OF JUSTICE,<br><br>     Defendants. | 09 Civ. 8071 (BSJ) (FM)<br><br>ECF Case |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

MELISSA GOODMAN (MG-7844)
JONATHAN HAFETZ (JH-0843)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-549-2500
Fax: 212-549-2629

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, New York 10004

May 6, 2010

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... i

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 1

    I.    DOD STILL HAS NOT MET ITS BURDEN TO SHOW ITS NEAR-COMPLETE REDACTION OF THE DETAINEE LIST IS JUSTIFIED UNDER EXEMPTION 1.... 1

        A.    DOD Has Not Sufficiently Shown that Each Category of Information Withheld, or Combinations Thereof, Are Properly Classified in Their Entirety ........................................................................................................... 2

        B.    *In Camera* Review of the List is Necessary ......................................................... 8

    II.    EXEMPTION 1 STILL DOES NOT SUPPORT THE CIA'S GLOMAR CLAIM. ........ 9

    III.    EXEMPTION 3 STILL DOES NOT SUPPORT THE CIA'S GLOMAR CLAIM. ...... 13

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008) ................................................................. 2

*Army Times Publ'g Co. v. Air Force*, 998 F.2d 1067 (D.C. Cir. 1993) ........................................ 3

*Assoc. Press v. Dep't of Def.*, 410 F. Supp. 2d 147 (S.D.N.Y. 2006) ........................................... 6

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) ....................................................... 13

*Carter v. Dep't of Commerce*, 830 F.2d 388 (D.C. Cir. 1987) ..................................................... 8

*CIA v. Sims*, 471 U.S. 159 (1985) .............................................................................................. 14

*Earth Pledge Found. v. CIA*, 988 F. Supp. 623 (S.D.N.Y. 1996) ......................................... 14, 15

*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56 (D.D.C. 2007) .......................... 11

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) ......................................................................... 11

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ........................................................................... 2, 8

*Hepting v. AT&T*, 439 F. Supp. 2d 974 (N.D. Cal. 2006) ........................................................... 13

*Louisville & Nashville R.R. Co. v. Mottley*, 219 U.S. 467 (1911) .............................................. 15

*Maqaleh v. Gates*, 604 F. Supp. 2d 205 (D.D.C. 2009), *appeals argued*,
   (D.C. Cir. Jan. 7, 2010) ........................................................................................................ 15

*Mead Data Cent. Inc. v. Dep't of the Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ......................... 8

*Ray v. Turner*, 587 F.2d 1187 (C.A.D.C. 1978) .......................................................................... 2

*Spirko v. U.S. Postal Serv.*, 147 F.3d 992 (D.C. Cir. 1998) ......................................................... 8

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ............................................... 9

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ........................................................................ 8

*Wash. Post v. Dep't of Def.*, 766 F. Supp. 1 (D.D.C. 1991) .................................................... 3, 11

*Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991) ................................................................... 6, 11, 12

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) ........................................................... 13

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) ........................................................................... 2, 11

**Statutes**

5 U.S.C. § 552 ................................................................................................................................ 8

50 U.S.C. § 403-1 ........................................................................................................................ 15

Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458 ..................... 15

**Other Authorities**

150 Cong. Rec. E2209-01 (Dec. 20, 2004) .................................................................................. 15

Exec. Order 13,292, 68 Fed. Reg. 15315 (Mar. 25, 2003) ...................................................... 2, 10

## INTRODUCTION

Plaintiffs respectfully submit this reply brief in support of their cross-motion for summary judgment. DOD's new declaration still does not provide sufficient justification for its blanket withholding of all of the data on the detainee list. DOD's treatment of Bagram detainees' citizenship, length of detention, and date, place, and circumstances of capture as unclassified information in other contexts, and its public release of this type of data about Guantánamo detainees – in aggregate form and in much more detail than plaintiffs' seek here – undermines DOD's assertion that *every* piece of information on the list is exempt from disclosure. The CIA's Glomar claim remains insufficiently justified and contradicted by other evidence as well. The CIA's new declaration does not explain in sufficient detail how acknowledging facts not only similar to those already disclosed by the CIA, but facts already disclosed by other agencies, is reasonably likely to result in harm. For these reasons, and the reasons stated previously, the Court should grant partial summary judgment in plaintiffs' favor. At a minimum, the Court should review the detainee list *in camera* before ruling in DOD's favor.

## ARGUMENT

I. DOD STILL HAS NOT MET ITS BURDEN TO SHOW ITS NEAR-COMPLETE REDACTION OF THE DETAINEE LIST IS JUSTIFIED UNDER EXEMPTION 1.

In response to plaintiffs' motion, DOD has released a less-redacted version of the list, acknowledging that not all of the data withheld was, in fact, properly classified. Supp. Barnea Decl. Exh. A. DOD has also supplemented Gen. Hood's declaration with that of Maj. Gen. Flynn. Although Maj. Gen. Flynn's declaration provides more than the conclusory assertions offered by Gen. Hood, it still fails to justify the sweeping withholding of nearly every piece of data on the list. Neither DOD's category-by-category arguments, Flynn Decl. ¶¶ 5-9, nor its invocation of the "mosaic" theory, *id.* ¶¶ 10-11, support the conclusion that *all* of the information withheld is properly classified and that release of *any* portion of it "reasonably could be expected

1

to result in damage to the national security." Exec. Order 13,292 § 1.1, 68 Fed. Reg. 15315 (Mar. 25, 2003); *see also ACLU v. Dep't of Def.*, 543 F.3d 59, 77 (2d Cir. 2008) (Exemption 1 *de novo* review requires courts to determine if information "properly" classified); *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009) (agency must prove "good reason to classify" information).[1]

    A. <u>DOD Has Not Sufficiently Shown that Each Category of Information Withheld, or Combinations Thereof, Are Properly Classified in Their Entirety</u>.

Both of DOD's arguments – that every data column is itself properly classified or that, even if some are not, the aggregation of the data renders the whole classified in its entirety – are undermined by recent developments at Bagram. DOD, in a welcome step towards transparency, opened the unclassified portion of some Detainee Review Board ("DRB") hearings – military hearings that determine who will remain imprisoned – to human rights observers, and placed no restrictions on what they could report. Prasow Decl. ¶¶ 3-5; Supp. Goodman Decl. ¶¶ 2-3, Exh. B. According to an observer who recently attended five DRBs, the information disclosed during each of the 1-3 hour open sessions – all of which was deemed unclassified – included the detainee's place of origin, and the location, date, and circumstances or basis for their capture. Prasow Decl. ¶¶ 5-7; *see also* Supp. Goodman Decl. ¶ 3, Exh. B. In one DRB, citizenship was discussed as well. Prasow Decl. ¶ 8. Similar hearings for Guantánamo detainees, of which DOD has released transcripts, regularly included discussion of citizenship, detention length, and the date, location, and circumstances of capture. Supp. Goodman Decl. ¶ 4. DOD cannot treat as classified here what it treats as unclassified in DRBs and analogous Guantánamo hearings.[2]

---

[1] *Wilson* was a First Amendment case but the court noted that the standard employed in *de novo* review of FOIA Exemption 1 claims is essentially the same. *Id.* at 186 n.7. Congress amended FOIA to ensure courts conduct meaningful *de novo* review of classification claims. *See Halpern v. FBI*, 181 F.3d 279, 291-92 (2d Cir. 1999); *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (Congress "stressed the need for an objective, independent judicial determination" of "national security" exemption claims).

[2] It seems that most, if not all, detainees on the September 2009 list have had a DRB and, if not released, will have another every six months. *Id.* ¶ 3, Exh. B. It also seems that DOD intends to permit human rights and media observers to attend DRBs in the future as well. Prasow Decl. ¶ 9.

DOD's near-blanket withholding is also undermined by the mass of data it has disclosed about Guantánamo detainees. Pl. Br. 9-11. DOD has not adequately explained this discrepancy. *See Wash. Post v. Dep't of Def.*, 766 F. Supp. 1, 9-12 (D.D.C. 1991) (where same or similar information already public, agency bears increased burden to specifically explain why disclosure would harm national security); *see also Army Times Publ'g Co. v. Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993). DOD concedes that citizenship information about Guantánamo detainees was never classified, Flynn Decl. ¶ 11, but attempts to distinguish the aggregate release of this information on the grounds that it was not released as part of "the larger data set in question here" and so "provided limited connectivity and contextuality," *id*. This argument, however, ignores that an immense "mosaic" of information about Guantánamo detainees' date, place, and circumstances of capture is now public due to DOD's own release of military proceeding and *habeas* documents, Hafetz Decl. ¶¶ 10-11; Supp. Goodman Decl. ¶ 4, which provide much more "connectivity and contextuality" than the list would provide here. DOD's release of this "aggregate" picture of Guantánamo detainees is powerful evidence that the Bagram detainee data – or at least some of it, on its own or in combination – is not properly classified here.

DOD asserts that release of the data in the Bagram list is different because it would "reveal too much" about "operational centers of gravity in an actual theater of war," Flynn Decl. ¶ 11, and "assist the enemy in predicting future military operational tactics, plans, and movements," *id.* ¶ 10. The redacted information in the list, however, would not reveal a complete snapshot of the military's long-running war effort in Afghanistan. The list does not contain data about the hundreds or even thousands of prisoners released before September 22, 2009, or those captured since. Thus, it likely paints a historical picture with significant gaps and would not reveal the recent trajectory of operations. Even accepting Maj. Gen. Flynn's premise, it does not justify withholding facts about Bagram detainees captured in the early years of the

war: information that is unlikely to reveal "future . . . tactics, plans, and movements." *Id.* ¶ 10. Indeed, this group of detainees is largely indistinguishable from the many Guantánamo prisoners captured in Afghanistan during earlier phases of the war and about whom much information has been made public. Haftez Decl. ¶¶ 10-11; Supp. Goodman Decl. ¶ 4. Nor does this argument justify withholding data about detainees who may not have been captured as part of the Afghanistan war effort at all, but rather far from Afghanistan and rendered to Bagram.

In any event, even accepting DOD's "mosaic" theory, it is does not justify withholding of every combination of information. DOD implicitly recognizes this: the main thrust of its argument for withholding dates, locations, and circumstances of capture is that this data is harmful *if released together*. Flynn Decl. ¶¶ 6-8. No such claim is made about citizenship and length of detention, *id.* ¶¶ 5, 9, which, if released without the other categories, would not reveal any operational information.[3] Likewise, disclosing the circumstances of capture data – whatever level of detail that column actually contains, which DOD still does not explain, *see infra* at 7-8 – if divorced from date and location data may reveal nothing sensitive about operations or nothing not already widely known; for example, that detainees were picked up at check points, during home raids, or during combat. Pl. Br. 10-11; Hafetz Decl. ¶¶ 7-9, Exh. H-V (DOD disclosures about captures in such circumstances, even with date or location).[4] In sum, DOD's "mosaic" theory does not justify withholding all, or even all combinations of, the redacted data in the list.

Nor has DOD sufficiently shown that each category, on its own, is properly classified. Indeed, where DOD justifies classification of each category, it more often than not resorts to arguments about the harm that would flow from release alongside other data. Flynn Decl. ¶¶ 6-8.

---

[3] As demonstrated in plaintiffs opening brief, Pl. Br. 6 n.3, 9, length of detention does not reliably correlate with date of capture. DOD has not rebutted plaintiffs' evidence on this point.

[4] DOD implicitly concedes this. It primarily argues that "circumstances of capture" is properly classified because "when *combined* with the dates and locations of capture [it] could reveal critical tactical information." Govt. Opp. Br. 22-23 (emphasis added).

4

*Citizenship*:  DOD admits that it never considered the citizenship of Guantánamo detainees classified and has not provided a persuasive justification for why the citizenship of Bagram detainees is different.  *See supra* at 2-4.  Indeed, it seems DOD does not even treat *Bagram* detainees' citizenship as classified in all instances; according to Maj. Gen. Flynn, Flynn Decl. ¶ 13, detainee ISNs indicate their nationality yet DOD has not classified these numbers.[5]  Nonetheless, DOD asserts that releasing citizenship data could help enemies "predict[] the direction of our future military operations which may target areas heavy with this citizenship demographic."  Flynn Decl. ¶ 5.  But DOD has already disclosed that all but about 30 of the detainees are Afghans, Hafetz Decl. ¶ 6, Exh. G, and thus that it operates in "areas heavy with [Afghan] citizen[s]."  Nor it is any secret that the military has operated in the border region between Pakistan and Afghanistan.  *See, e.g.,* Somini Sengupta, *U.S. Forces Kill 24 Militants Fleeing to Pakistan*, N.Y. Times, July 15, 2005; Dexter Filkins, *FBI and Military United in Pakistan to Hunt Al Qaeda*, N.Y. Times, July 14, 2002.  Thus, it would be unsurprising if it were confirmed that some detainees are Pakistani.  *See* Prasow Decl. ¶ 8.  Moreover, because the list pertains only to people captured before September 2009, it is unlikely to provide much insight into the "direction of . . . future" operations.  Flynn Decl. ¶ 5.  This is particularly true of detainees held at Bagram as long as 8 years.  DOD provides no justification for suppressing the citizenship of long-held detainees.

DOD's remaining arguments about citizenship data are similarly unpersuasive.  DOD asserts that it could reveal "sources" and "levels of cooperation/opposition," Flynn Decl. ¶ 5, but it remains unclear how one could glean whether a detainee has cooperated or who has provided intelligence just from a detainee's citizenship, Pl. Br. 8-9.  DOD also asserts that it could put detainees in jeopardy, Flynn Decl. ¶ 5, but this argument is just as "thin," "conclusory," and

---

[5] DOD withholds the ISNs under Exemption 2, not Exemption 1.  Govt. Opp. Br. 28.  In light of DOD's amplified explanations, plaintiffs no longer challenge DOD's Exemption 2 withholding of ISNs.

5

"unparticularized" as the identical argument Judge Rakoff rejected (albeit under Exemption 7) with respect to similar Guantánamo data, *Assoc. Press v. Dep't of Def.*, 410 F. Supp. 2d 147, 150 (S.D.N.Y. 2006). DOD suggests that disclosing citizenship data might negatively impact detainee release operations or diplomatic relations, Flynn Decl. ¶ 5, but does not explain how nor why these concerns exist here and yet do not exist with respect to Guantánamo. If anything, release of Guantánamo citizenship data would have been more likely to disrupt foreign relations given the significant controversy surrounding U.S. actions there. Yet DOD did not even consider that information classified. Nor is there any indication that disclosure of Guantánamo citizenship data has impeded repatriation efforts. In any case, these repatriation and diplomatic concerns do not even apply to the vast majority of prisoners on the list: Afghans. Afghan citizenship data, at a minimum, should be released.

*Length of Detention:* DOD argues that disclosing length of detention data could compromise intelligence operations because it might reveal correlations between detainee behavior (keeping silent or cooperating) and detention length, thereby permitting future detainees to thwart prosecution or intelligence-gathering efforts. Flynn Decl. ¶ 9. This is too speculative to support withholding. *See Wiener v. FBI*, 943 F.2d 972, 981 (9th Cir. 1991). Detention length, by itself, reveals nothing about a detainee's behavior. Nor is detention length data likely to teach future detainees how to obtain "more rapid release," Flynn Decl. ¶ 9, as detainees on the list are (or were in September) still imprisoned. This information could be obtained, by contrast, from released detainees who are *not* on the list and are free to speak. In any event, the list already reveals length of detention in relative terms. It is evident that the list is arranged in chronological order: detainees publicly-known to have been held for more than eight years (Wazir and Bakri) have the lowest SEQ numbers, *see* Hafetz Decl. ¶ 9.a, whereas the second-last person on the list (Dawood) was, according to DOD, detained on September 1, 2009, Hafetz Decl. ¶ 7.b, Exh I;

Supp. Barnea Decl. Exh. A.  DOD has not shown how each detainee's more precise length of imprisonment is properly classified.

*Location and Date of Capture*:  DOD still does not explain the level of specificity of the location data category.  It may be so general – i.e. names of towns – that its release (even in combination with citizenship or detention length data) would reveal no specific operational details and nothing not already well-known.[6]  In any event, DOD's primary justification for withholding capture date and location is that it could allow hostile forces to understand and predict troop movements and tactics.  Flynn Decl. ¶¶ 6, 7.  The list, however, concerns only a sliver of the larger military effort, given it says nothing about detainees released before September 2009, and nothing about military actions in the last six months.  *See supra* at 3-4.  Even if it did provide a comprehensive snapshot, this rationale would not justify classification of capture date and location data for detainees captured in early years of this now nine-year war (which would reveal nothing about current tactics) or those rendered to Bagram from countries far from Afghanistan (which would reveal nothing about the war effort at all).  *Id.*

*Circumstances of Capture:* DOD asserts that disclosure of this data could reveal too much about operations and impede future activities.  Flynn Decl. ¶ 8.  But DOD still does not sufficiently describe the content of this column except to say "the level of detail disclosed" is "limited."  *Id.*  Without knowing how "limited" it is, plaintiffs cannot effectively counter DOD's claim that its release would allow others "to intuit military SOP, sources of intelligence, or other crucial operational factors."  *Id.* ¶ 8.  Again, it could be that this column reveals little operational detail or only general tactics already acknowledged (e.g. "in home raid" or "in possession of explosives" or "at check point"), *supra* at 4, and is not, by itself, properly classified.

---

[6] DOD's past and current movements through the country are likely no secret to the Afghans; indeed, DOD sometimes even releases information about the geographic direction of its future operations.  *See, e.g,* Ismail Sameem, *Petraeus Warns Kandahar of Violent Summer Ahead*, Reuters, Apr. 30. 2010 (General Petraeus discussing future operations in Kandahar).

B. *In Camera* Review of the List is Necessary.

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided." 5 U.S.C. § 552(b). Courts may conduct *in camera* review of withheld material to ensure the government complies with this obligation and to ensure that withheld information is properly classified. *Id.* § 552(a)(4)(B); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (courts have "broad discretion" to conduct *in camera* review whenever it is needed "to make a responsible *de novo* determination on the claims of exemption").

*In camera* review is particularly important here because DOD has not described the capture location and circumstances categories in sufficient detail to allow plaintiffs fully to counter DOD's claim. *See Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987) (*in camera* review appropriate where withheld information is "not described in sufficient detail"); *Mead Data Cent. Inc. v. Dep't of the Air Force*, 566 F.2d 242, 262 n.59 (D.C. Cir. 1977) (*in camera* review often necessary to ensure "descriptions are accurate and as complete as possible"). *In camera* review is the only way to mitigate the informational imbalance between the parties. *See Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973) ("lack of knowledge by the party seeing disclosure seriously distorts the traditional adversar[ial]" process).

*In camera* review is also particularly appropriate here because there is reason to believe DOD's withholding is more sweeping than necessary to protect its legitimate security concerns. *Halpern*, 181 F.3d at 292 (*in camera* review appropriate where claims "too sweeping" or agency may be withholding "whole documents simply because there was some exempt material in them"). Indeed, DOD's own actions suggest it may be over-classifying the document: (1) it has opened some DRBs to observers, where the kind of information it is withholding here is deemed unclassified, Prasow Decl. ¶¶ 3-8; Supp. Goodman Decl. ¶ 3; (2) it has already once acknowledged the list was over-classified and that some purportedly classified data had been

8

officially disclosed, Govt. Opp. Br. 26 n.6; and (3) it has failed to unredact all of the officially-acknowledged information to which plaintiffs have pointed, despite assurances that DOD "has conformed the redactions [on new list] to the public record, Supp. Barnea Decl. ¶ 2.[7] All of this suggests that DOD not has conducted a careful segregability analysis to ensure it is withholding only properly classified data. It is not plaintiffs' burden to bring all officially-acknowledged information to DOD's attention; it is DOD's burden to demonstrate there is no segregable information being withheld. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (where requesters "successfully rebut" presumption agency has "complied with" segregability obligation, the "burden lies with the [agency] to demonstrate that no segregable, nonexempt portions were withheld"). In these circumstances, *in camera* review is appropriate.[8]

## II. EXEMPTION 1 STILL DOES NOT SUPPORT THE CIA'S GLOMAR CLAIM.

In a new declaration, the CIA now asserts that it cannot process the request for interrogation or rendition records (Requests #10 and #6) because it cannot reveal whether the CIA "maintains [an] intelligence interest in" or has ever "capture[d] or transfer[ed]" suspected terrorists held by DOD in Afghanistan. Govt. Opp. Br. 5; Supp. Hilton Decl. ¶¶ 5, 7. The CIA maintains these are properly classified secrets even though:

- Presidents, CIA Directors, DOJ, and DOD have disclosed that the CIA has played a major role in capturing, interrogating, and transporting from one country to U.S. military custody in another, suspected terrorists abroad;[9]

- CIA Directors have disclosed that the CIA has been "at the center of [the] fight" in Afghanistan, "gather[ing] information" about, "pursu[ing]," "captur[ing]," and "remov[ing] from the battlefield" suspected al-Qaeda and Taliban members in Afghanistan;[10]

---

[7] Specifically, data about detainees Mohammad Dawood (ISN #20022), Mullah Karim (ISN #4125), and Zalmai (ISN #4137) were included in a DOD press release, Hafetz Decl. ¶ 7(b), Exh. I, but remain unredacted in DOD's revised detainee list, Supp. Barnea Decl. Exh. A.

[8] At a minimum, the Court should require DOD to report the steps it has taken to ensure that information officially disclosed, or publicly disclosed in DRBs, in not inappropriately withheld.

[9] Pl. Br. 16-18; Goodman Decl. ¶¶ 11-16, 23 (quotes from President Bush, CIA Directors Panetta and Hayden, State Department officials Rice and Kojm, DOJ records, and DOD press releases).

[10] Pl. Br. 19-20; Goodman Decl. ¶¶ 3-5 (quotes from CIA Directors Panetta and Hayden).

- CIA Directors and the Director of National Intelligence have disclosed that CIA and DOD work cooperatively in Afghanistan at both CIA and military bases, including Bagram;[11]

- CIA Director Hayden, a CIA Inspector General report, and DOD reports and briefings disclose that the CIA has conducted interrogations at military bases in Afghanistan, a practice which led to abuse and prompted DOD to create guidelines to govern joint CIA and DOD interrogation activities at DOD detention facilities in Afghanistan and elsewhere;[12] and

- DOD investigatory reports and studies and a member of Congress have disclosed, and U.N. Human Rights Council and the Council of Europe investigatory reports confirm, that the CIA has interrogated prisoners at Bagram and has transferred prisoners to and from Bagram;[13]

The government concedes these disclosures exist and that many come from CIA and executive branch sources. Govt. Opp. Br. 12 n. 5. Nonetheless, it dismisses them as irrelevant because they are not "matching" or "official" disclosures that *waive* the CIA's exemption claim, *id.* at 7-13 (citing FOIA waiver law). This is a red herring. These disclosures by official sources are significant not because they may waive the CIA's Exemption 1 claim but because they call its validity into question. In other words, they undermine the CIA's assertion that its "intelligence interest in" or "capture and transfer of" any of the thousands held by DOD in Afghanistan since 2001 are *properly* classified facts whose disclosure "reasonably could be expected" to harm national security. Exec. Order 13,292 § 1.1; *see supra* at 1.[14]

Where the CIA claims that it cannot confirm facts that are not only similar to those it has disclosed previously, but already have been made public by other agencies, it has a heightened burden to explain very specifically why further confirmation is likely to damage national

---

[11] Pl. Br. 20-21; Goodman Decl. ¶¶ 5-6, 26 (quotes from CIA Directors Panetta and Hayden, DNI McConnell, and CIA report).

[12] Pl. Br. 21-22; Goodman Decl ¶¶ 16-17, 26-28, 30-31, 33 (quotes from CIA Director Hayden, CIA report, DOD Church, Jacoby, and Fay reports, DOD task force records, and DOD regulation)

[13] Pl. Br. 21-23; Goodman Decl ¶¶ 16-21, 28-31, 35, 37 (quotes from Rep. Rogers, DOD Church and Jacoby reports, DOD studies, DOD task force records, and human rights bodies' reports). Bagram has always been DOD's main and, according to DOD, is now "the only" detention facility in Afghanistan. Hilary Andersson, *Afghans 'Abused at Secret Prison' at Bagram Airbase*, BBC News, Apr. 15, 2010.

[14] The suggestion, Govt. Opp. Br. 10, that plaintiffs rely primarily on news articles is misleading; where they rely directly on articles, it is because they contain statements by named high-level officials.

security.  *See Wash. Post*, 766 F.2d at 9 (more "specific" explanations and "more searching review" required when facts already public); *cf. Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (accepting withholding only where CIA's "affidavit persuasively describe[ed] . . . the untoward consequences that could ensue were it required either to confirm or to deny statements made by another agency").  The CIA has not met that burden here; to the contrary, its conclusory assertions leave many important questions unanswered.  Pl. Br. 4, 8 (conclusory justifications insufficient); *see also Wiener*, 943 F.2d at 981 (rejecting withholding justifications that "le[ft] unanswered" many "relevant questions").  For instance, why would confirming its "intelligence interest in" Bagram detainees cause harm if the CIA has already disclosed that it pursues, captures, and gathers intelligence from al-Qaeda and Taliban fighters – the very people who end up at Bagram?  How would confirming the CIA may have rendered prisoners to Bagram cause harm if Presidents, the CIA, and DOJ have already disclosed that the CIA captures terrorists in one country and transfers them to military custody in another, and if it is widely-known that Afghanistan is one of the few places the military detains people, *see* Pl. Br. 21?  How would confirming that the CIA "use[d]" or "appli[ed]" its known interrogation and rendition methods in this "circumstance," Supp. Hilton Decl. ¶ 8, cause harm if the CIA and DNI have disclosed that CIA and DOD work together closely at military bases in this location, and if DOD has already disclosed that the CIA has applied its interrogation and transfer methods to prisoners in military detention facilities in Afghanistan?  Neither the CIA's conclusory statements nor its official acknowledgment argument answer these questions.  Insisting facts have not yet been officially disclosed does not demonstrate "good reason to classify" them.  *Wilson*, 586 F.3d at 185; *see also Elec. Privacy Info. Ctr. v. Dep't of Justice*, 511 F. Supp. 2d 56, 71 (D.D.C. 2007) ("declaring 'because we say so' is an inadequate method" of justifying secrecy).

11

The CIA asserts a need to "preserve[e] . . . ambiguity" to keep al-Qaeda "guessing." Supp. Hilton Decl. ¶ 8. But given that for years the military and CIA have openly pursued, captured, gathered intelligence about, and detained suspected terrorists in Afghanistan, and given that for years the CIA's capacity to capture people in one country and transfer them to military custody in another has been well-known, it is reasonable to assume that Al-Qaeda operatives "adjusted [their] tactics," *id.* ¶ 7, long ago to avoid capture and interrogation in, and rendition to, Afghanistan. In this context, the CIA's "boilerplate" statements about the need for ambiguity are insufficient. *Wiener*, 943 F.2d at 978. The CIA's argument also suffers a more fundamental flaw: it assumes revelation of *current* interests and activities. Supp. Hilton Decl. ¶ 7 (whether it "has" interest); *id.* ¶ 8 (whether it "employs" sources and methods); Govt. Opp. Br. 5 (whether it "maintains" interest). But plaintiffs' have requested records created since September 2001; acknowledging it has responsive records would reveal only that the CIA may have interrogated or transferred any of the thousands of Bagram detainees at some time in the past nine years. The CIA fails to address how acknowledging even a purely historical interest in or activities concerning this class of detainees is reasonably likely to prompt al-Qaeda to "adjust[] their tactics" now. *Id.* ¶ 8.[15]

The CIA's asserts that confirming whether it has ever "transferred people across international borders" would disclose "liaison" or "foreign government relationships." Supp. Hilton Decl. ¶ 6. But the CIA has already announced that it has "transferred people across international borders" through its rendition program. Pl. Br. 16-17. More importantly, processing the rendition records request would not require the CIA to reveal from where

---

[15] Processing the request would not suggest the CIA has an interest in the "particular" detainees whose names are now public, Govt. Opp. Br. 6, as opposed to the hundreds of prisoners released prior to September 2009 whose names have *not* been made public. Pl. Br. 24-25 (discussing how processing request would not require CIA to reveal anything at all about specific detainees).

12

prisoners were rendered or which foreign partners may have provided assistance. This information can be withheld during production, if appropriate. Pl. Br. 25.[16]

The CIA's claims should not be afforded "substantial weight." Govt. Opp. Br. 6. Plaintiffs have amassed a substantial record that shows agencies and officials have publicly disclosed information that is the same or similar to that which the CIA insists is classified here. This record – which the CIA does not rebut beyond its waiver argument – "controvert[s]" the CIA's justification for secrecy. *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009). Although the Court must afford the CIA some degree of deference, it should not "acquiesce[ ]" to insufficiently supported claims for blanket secrecy contradicted by other evidence. *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998); *Hepting v. AT&T*, 439 F. Supp. 2d 974, 995 (N.D. Cal. 2006) (where a subject "has been so publicly aired . . . defer[ing] to a blanket assertion of secrecy" would "abdicate" a judicial duty).

III.     EXEMPTION 3 STILL DOES NOT SUPPORT THE CIA'S GLOMAR CLAIM.

The CIA concedes it has acknowledged the intelligence methods at issue here. Govt. Opp. Br. 14. Instead, the CIA now argues that it cannot confirm whether records exist because it needs to "preserve ambiguity" about its "use" or "application of" these methods in "particular circumstances or locations." *Id.* at 14; Supp. Hilton Decl. ¶ 8. Applying this logic here, the CIA asserts that it cannot confirm whether it has applied acknowledged methods (interrogation and transfer) to a class of people to whom they are meant to be applied (suspected terrorists and combatants) and to whom the CIA admits it pursues, captures, and gathers intelligence about (suspected terrorists and combatants in Afghanistan) in a geographic location the CIA openly

---

[16] The government suggests, Govt. Opp. Br. 7, that the *Vaughn* index requirement renders the CIA incapable of protecting classified information. But the CIA retains full control of what it redacts or withholds in full and how generally it describes its withholdings. When processing similar requests for rendition, interrogation, and detention records, the CIA has always found a way to fulfill its *Vaughn* obligations without disclosing sensitive information. Goodman Decl. ¶¶ 44-49.

13

operates (the Afghanistan war zone) in the type of facility the CIA is known to have employed its interrogation and transfer methods in the past (military detention facilities in Afghanistan), and at a specific facility the CIA is known to maintain a presence (Bagram). Although the CIA has wide latitude to protect sources and methods, *see CIA v. Sims*, 471 U.S. 159 (1985), its claims here exceed the outer limit of what it can legitimately shield.

The government asserts that courts "routinely" find that "revealing whether or not CIA operates at a particular location or has an intelligence interest in a certain group of people" reveals sources and methods. Govt. Br. 15 n. 8. It cites, however, only one case, *Earth Pledge Found. v. CIA*, 988 F. Supp. 623 (S.D.N.Y. 1996). In *Earth Pledge* plaintiffs requested cables between an unacknowledged CIA station in the Dominican Republic and CIA headquarters about its contacts with a particular group of dissidents. *Id.* at 625. After requiring the CIA to "explain in more detail" how confirming the existence of the station or cables "would jeopardize national security and compromise the CIA's ability to gather intelligence, *id.* at 626, the Court upheld the CIA's Exemption 3 because it found that that the CIA had sufficiently shown that acknowledging contacts with dissidents would jeopardize specific sources and "break the CIA's pledge of confidentiality" to those sources, *id.* at 627, and that confirmation of "an unconfirmed CIA field station" would "cause a confrontation with the Dominican Republic," i*d.* at 628.

This case is different. First, the CIA has not provided specific detail about why confirming its intelligence interest in or capture and transfer of this group of detainees would compromise its ability to gather intelligence. Second, confirming it has responsive records here would not jeopardize specific sources. Processing the request would not require the CIA to reveal anything about specific sources at Bagram, Pl. Br. 24-25, 28-29, but rather to acknowledge what is already widely known, confirmed by DOD, and easily inferable from the CIA's own prior disclosures: that it may have looked to suspected terrorists in U.S. military

14

custody as a potential source of intelligence and may have transferred some of the suspected terrorists it acknowledges it captures inside or outside of Afghanistan to that location. Third, the CIA has not shown that acknowledging the existence of records is likely to cause conflict with the Afghan government. Unlike the situation in *Earth Pledge,* the CIA has acknowledged its stations and operations in Afghanistan and has worked with the military to fight terrorists alongside and in support of the Afghans. Bagram, moreover, is a that the Afghan government has publicly ceded to the United States' exclusive control and jurisdiction. *See Maqaleh v. Gates*, 604 F. Supp. 2d 205, 222-23 (D.D.C. 2009), *appeals argued*, (D.C. Cir. Jan. 7, 2010); Pl. Br. 34 n. 13. In sum, neither *Earth Pledge*, nor any other case cited in the government's opening brief, Pl. Br. 28-29, supports the proposition that the CIA can protect as "sources or methods" the mere existence of records about its use of known techniques to a group of people in which it is known to have an interest in a place it is publicly operating.[17]

## CONCLUSION

For these reasons and the reasons stated in plaintiffs' opening brief, plaintiffs respectfully urge the Court deny the government's motion for partial summary judgment, and grant plaintiffs' cross-motion for partial summary judgment.

---

[17] Contrary to CIA's arguments, Govt. Opp. Br. 15-19, the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, on its face, transferred the authority to invoke 50 U.S.C. § 403-1(i) as a FOIA withholding statute to the Director of National Intelligence ("DNI"), Pl. Br. 27-28. The DNI himself recently acknowledged this transfer of authority in another FOIA case, by submitting a declaration stating that that he had reviewed and approved the CIA's invocation of this very withholding statute. Supp. Goodman Decl. ¶ 5, Exh. E. Moreover, Congress' replacement of the words "Director of Central Intelligence" with "Director of National Intelligence" must be given meaning. *See Louisville & Nashville R.R. Co. v. Mottley*, 219 U.S. 467, 475 (1911) (courts must "give effect" to "all the words used by Congress"). Here, Congress' intent was quite clear: to transfer certain powers from the CIA to a new DNI. *See* 150 Cong. Rec. E2209-01 (Dec. 20, 2004) (statement of Rep. Hoekstra, Chair of Conference Comm.) ("[t]he nature of the authorities to be granted to the [DNI] and the relationship of the [DNI] to other Federal officials were delicate and precisely negotiated issues"). The CIA's proposed construction would render Congress' amendments nugatory and should be rejected.

        Respectfully submitted,

        __s/ Melissa Goodman_____
        MELISSA GOODMAN (MG-7844)
        JONATHAN HAFETZ (JH-0843)
        American Civil Liberties Union Foundation
        125 Broad Street, 18th Floor
        New York, New York 10004
        Phone: 212-549-2500
        Fax: 212-549-2629

        CHRISTOPHER DUNN (CD-3991)
        ARTHUR EISENGBERG (AE-2012)
        New York Civil Liberties Union
        125 Broad Street, 19th Floor
        New York, New York 10004

May 6, 2010